YAMAHA MOTOR CO., LTD., Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

BRUNSWICK CORP. and Mariner
Corp., Petitioners,

v.

FEDERAL TRADE COMMISSION,
Respondent.

Nos. 80–1760, 80–1913.

United States Court of Appeals,
Eighth Circuit.

Submitted May 18, 1981.

Decided July 29, 1981.

As Modified on Denial of Rehearing and
Rehearing En Banc in No. 80–1913
Sept. 11, 1981.

John R. Ferguson, Janine H. Coward, Peabody, Rivlin, Lambert & Meyers, Washington, D. C., Henry Y. Ota, Shigeru Watanabe, Mori & Ota, Los Angeles, Cal., Thomas C. Walsh, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for petitioner Yamaha Motor Co., Ltd.

James H. Sneed, Gen. Counsel, Howard E. Shapiro, Deputy Gen. Counsel, W. Dennis Cross, Asst. Gen. Counsel, David M. Fitzgerald (argued), Leslie Rice Melman, Jack Schwartz, Attys., F. T. C., Washington, D. C., for respondent.

Patrick W. O'Brien (argued), Kenneth J. Jurek, Chicago, Ill., John C. Shepherd, St. Louis, Mo., for petitioners Brunswick Corp. and Mariner Corp.; Mayer, Brown & Platt, Chicago, Ill., Shepherd, Sandberg & Phoenix, St. Louis, Mo., William L. Niemann, James H. Wehrenberg, Skokie, Ill., of counsel.

Before LAY, Chief Judge, ARNOLD, Circuit Judge, and BECKER,* Senior District Judge.

ARNOLD, Circuit Judge.

These petitions for review challenge an order of the Federal Trade Commission holding that a joint-venture agreement entered into by petitioners for the manufacture and sale of outboard motors is unlawful under Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The parties to the agreement were Yamaha Motor Company, Ltd., petitioner in No. 80–1760, and Brunswick Corporation and its subsidiary Mariner Corporation, petitioners in No. 80–1913. The principal question presented is whether the Federal Trade Commission had the support of substantial evidence on the record as a whole when it concluded, in the words of Section 7, that the effect of the joint venture "may be substantially to lessen competition." We think the answer to this question is yes, and we therefore affirm the order of the Commission, with some modifications of the remedy it imposed.

### I. THE FACTS

*The parties.* Brunswick is a diversified manufacturer whose products include recreational items. Brunswick began making outboard motors in 1961, when it acquired what is now called its Mercury Marine Division (Mercury). Brunswick is the second largest seller of outboard motors in the United States. Between 1971 and 1973 its share of the outboard motor market fluctuated between 19.8% and 22.6% by unit volume and between 24.2% and 26% by dollar volume. Brunswick also sells its Mercury outboards in Canada, Australia, Europe, and Japan.

Before entering the joint venture, Brunswick, through Mercury, was considering development of a second line of outboards in an effort to increase its market share. Mariner was to become this second line, which Brunswick hoped would expand the

* The Hon. William H. Becker, Senior Judge, United States District Court for the Western — District of Missouri, sitting by designation.

dealer network carrying both the Mercury and Mariner brands.

Yamaha is a Japanese corporation incorporated by Nippon Gakki Company, Ltd. In 1972, it made outboard motors, motorcycles, snowmobiles, and boats. Since 1961, Yamaha has sold snowmobiles, motorcycles, and spare parts to Yamaha International Corporation, a wholly owned subsidiary of Nippon Gakki, which distributes to the United States. In 1972, 40% of Yamaha's total sales were from exports to this country, and 70% of its total production was for export to some country other than Japan. Yamaha manufactures outboard motors through Sanshin Kogyo Company, Ltd., also a Japanese corporation. Since 1969, when Yamaha acquired 60% of Sanshin's stock, Sanshin has produced Yamaha brand outboard motors, and they are sold in most outboard motor markets throughout the world.

*The Joint Venture Agreement.* On November 21, 1972, Brunswick and Yamaha entered into a joint venture under which Brunswick, through Mariner, acquired 38% of the stock of Sanshin. Yamaha's share in Sanshin also became 38%, with the balance of the stock held by others not involved here. Sanshin was to produce outboard motors and sell its entire production to Yamaha. Some of the motors were to be sold by Yamaha under its own brand name, while the rest, physically identical, were to be resold by Yamaha to Mariner, to be marketed by it under the Mariner brand name.

Under the agreement Sanshin's governing board had eleven directors, six selected by Yamaha and five selected by Brunswick. Certain corporate transactions, such as expansion of product lines or budget approval, required the approval of seven of the directors. In addition, there was a four-person "operating committee," on which Brunswick and Yamaha were equally represented. The agreement was to last an initial term of ten years, with automatic three-year extensions to follow, but either party had the right to terminate it at the end of any term, by giving three years' written notice.

A collateral or ancillary agreement gave Brunswick the exclusive right to sell Sanshin-produced outboards in the United States, Canada, Mexico (with some exceptions), Australia, and New Zealand. Yamaha obtained the exclusive right to the sale of Sanshin outboards in Japan. In the rest of the world's markets, Sanshin-produced Yamaha and Mariner engines could be sold in competition with one another. There were several other collateral agreements, which (1) barred Yamaha from manufacturing directly or indirectly the same or similar engines made by Sanshin or from purchasing any other outboard motors from other suppliers for resale, (2) limited competition between Brunswick and Yamaha in those remaining markets where both were permitted to sell Sanshin-produced motors, and (3) prohibited Brunswick from manufacturing any products competitive with those then produced by Yamaha, except snowmobiles.

*The Market.* The United States outboard motor industry is often divided into low-horsepower and high-horsepower segments, both of which are dominated by a few firms. The four largest firms in 1973 were Outboard Marine Corporation (OMC), which produces the Johnson and Evinrude brands, Brunswick, Chrysler, and Eska. These four firms accounted for 94.9% of the United States market in terms of units sold, with the top two firms, OMC and Brunswick, controlling 72.9%. Market-share totals by dollar volume indicate even greater concentration. The top four firms accounted for 98.6%, with the same top two firms accounting for 85%.

The outboard motor industry, though productive of rapid growth in sales and high profits, has not attracted new entrants. On the contrary, it has experienced a decline in the number of firms. Of the eight competitors active in 1965, three had departed by 1969.

## II. PROCEEDINGS BELOW

This case was formally instituted on April 15, 1975, when a complaint was filed challenging the legality of the joint-venture

agreement under Sections 7 and 5, and alleging that certain of the collateral agreements were unlawful as "unfair methods of competition" under Section 5. After a lengthy hearing before an administrative law judge, the ALJ issued an initial decision recommending that the complaint be dismissed.[1] He found that "Yamaha was a likely potential unilateral entrant into the United States high horsepower outboard market, and in fact was the most likely potential entrant; and Yamaha exerted, prior to the joint venture, a substantial procompetitive effect on the behavior of those in the market from its position on the edge of the market." A–154. The ALJ nonetheless concluded that the net effect of the joint venture was to increase competition, not lessen it: "the main objective fact in this case ... is that the joint venture added to the relevant market a new procompetitive force—the Mariner line of outboard motors." A–159. The ALJ also found that Yamaha, as of 1972, when the joint venture was entered into, "was not considering entering on its own in the near future and had no concrete plan to do so." A–120.

On appeal, the Commission reversed. On November 9, 1979, it held that Yamaha was, in 1972, both an actual and a potential competitor of Brunswick.[2] The FTC did not find the elimination of Yamaha as an independent actual and potential competitor outweighed by any procompetitive effects of the joint venture. In particular, it rejected the ALJ's characterization of Mariner as a new or additional force increasing competition in the sale of outboard motors in the United States. The Commission also

held unlawful three collateral agreements associated with the formation of the joint venture: (1) The agreement precluding Yamaha from marketing the joint-venture output in North America, and precluding Brunswick from doing so in Japan, but leaving Brunswick free to continue selling its Mercury brand all over the world; (2) the agreement that Brunswick would not invite Yamaha dealers in the so-called "non-exclusive markets," principally Europe and South America, to join the Mariner network;[3] and (3) the Technical Assistance Agreement for exchange of certain technical information, providing that Mercury would not manufacture any product competitive with those then being made by Yamaha, with the exception of snowmobiles. The Commission remanded the matter to the ALJ with directions to make additional findings and formulate a recommended remedial order.

The ALJ promptly complied with this direction, and the Commission in due course issued an order in substance adopting his recommendations as to appropriate relief. The FTC's final order, entered on August 14, 1980, directed that the joint-venture agreement be rescinded.[4] It ordered Brunswick and Mariner, within 90 days from the date the order became final, to sell the Sanshin stock back to Yamaha at a price based on "the value of the net tangible assets per share, computed and adjusted to the last day of the six-month term immediately preceding the date of the sale." ¶ I, at [1980] CCH Trade Reg. Rep. p. 21,917. The order also prohibited Brunswick and Mariner from making or enforcing any agreement preventing any person from

1. For the ALJ's initial decision, see pp. A–66 through A–168 of the Joint Appendix filed by counsel for all parties in this Court. Pages of the Joint Appendix will be cited as A–—— in this opinion.

2. Neither of the Commission's opinions has, as of this writing, been officially reported. The Commission's opinion on liability is unofficially reported as *Brunswick Corp.*, [1979] CCH Trade Reg. Rep. ¶ 21,623. It is also found at A–170–200. Commissioner Pitofsky wrote the unanimous opinion, joined in by three other members. One member did not participate.

3. As part of this agreement, Mercury's President (who was also Mariner's Chairman), told Yamaha that "we recognize that ... our basic philosophy must be to respect each other's position ...." Complaint Counsel's Exhibit (CCX) 77–C (letter of August 10, 1973).

4. The Commission's opinion on relief is unofficially reported at [1980] CCH Trade Reg. Rep. ¶ 21,740. It is also found at A–230–41. Commissioner Pitofsky again wrote for the Commission.

manufacturing, selling, or distributing outboard motors in the United States (¶ IV, *id.* at p. 21,918); it forbade Yamaha to make or observe any agreement that would prevent it from manufacturing, selling, or distributing outboard motors in the United States (¶ V, *ibid.*); and it prohibited Brunswick, Mariner, and Yamaha, for a period of three years, from making any acquisition in the outboard-motor industry without the prior approval of the Commission (¶ VI, *ibid.*).

Brunswick (together with Mariner) and Yamaha have filed separate petitions for review. Brunswick's principal argument is that the findings of violations of Sections 7 and 5 are not supported by substantial evidence. It also, and in the alternative, objects to the remedy of divestiture of the Sanshin stock and asserts that certain other portions of the FTC's remedial order are not reasonably related to any violation found.[5] Yamaha does not challenge the Commission's basic holding that the joint venture was unlawful. It seems content to terminate the relationship entirely. It does argue that any finding as to it should be based only on Section 5 of the FTC Act, since only Brunswick, not Yamaha, acquired any stock as part of the joint-venture agreement, and acquisition of stock, it is said, is a *sine qua non* of Section 7 liability. Yamaha also asks that the remedial order be modified: (1) by valuing the Sanshin stock it must re-purchase as of a date prior to the FTC's finding of liability on November 9, 1979; (2) by freeing it from certain restrictions on future distribution of outboard motors in the United States; and (3) by striking the three-year prohibition on acquisitions without Commission approval.

## III. ANALYSIS

 We start by reminding ourselves that our review of the Commission's findings of fact (on which this whole case turns) is limited. Section 11(c) of the Clayton Act,

15 U.S.C. § 21(c), provides that "the findings of the commission . . . as to the facts, if supported by substantial evidence, shall be conclusive." And Section 5(c) of the Federal Trade Commission Act, 15 U.S.C. § 45(c), states: "The findings of the Commission as to the facts, if supported by evidence, shall be conclusive."[6] This standard applies notwithstanding the fact that the Commission's findings vary in some respects from the recommendations of the ALJ. See *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We are mindful that the ALJ's findings and observations must be considered, along with the rest of the record, in determining whether the evidence supporting certain findings is substantial. For "evidence supporting a conclusion may be less substantial when an impartial, experienced [ALJ] who has observed the witness and lived with the case has drawn conclusions different from the [Commission's] than when he has reached the same conclusions." *Id.* at 496, 71 S.Ct. at 468. The significance of an ALJ's findings, on the other hand, "depends largely on the importance of credibility in the particular case." *Ibid.* Here, the Commission's differences from the ALJ turn more on what inferences should be drawn from the established facts, than on belief or disbelief of testimony from witnesses whom the ALJ could observe face to face. And through the whole process we are alert to the fact that Congress has entrusted the fact-finding process primarily neither to us nor to the ALJ, but to the Commission itself.

There are two more threshold questions. Section 7 prohibits any corporation engaged in commerce from acquiring, directly or indirectly, the stock or assets of any other corporation engaged in commerce "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or

---

5. Brunswick also asks us to set aside the Commission's order because it failed to disqualify one of the law firms retained by Yamaha. We reject this request and do not choose to discuss it at any further length.

6. We assume that the same substantial-evidence standard governs our review of FTC Act and Clayton Act findings, despite the absence of the word "substantial" in Section 5(c) of the FTC Act.

tend to create a monopoly." 15 U.S.C. § 18. Thus, we must define the relevant geographic (section of the country) and product (line of commerce) markets prior to resolving whether any specific conduct is violative of the Clayton Act. As for the relevant geographic market, our task is an easy one. The parties have stipulated that the United States is the relevant geographical market. The Commission found the relevant product market to be all outboard motors, including submarkets for low-horsepower (20 horsepower and below) and high-horsepower motors. Though the ALJ's determination differed somewhat, this finding by the Commission is not challenged on review.

We now turn to the arguments for reversal urged by the appellants. The arguments for Brunswick and Yamaha are several and distinct. Each will be discussed in turn, beginning with those of Brunswick.

*Brunswick's Arguments for Reversal.*

Brunswick first challenges the Commission's finding that the joint-venture agreement is violative of § 7 of the Clayton Act as not supported by substantial evidence. This general attack necessarily involves several points, because the Commission's finding of a § 7 violation rests on two alternate grounds. Those grounds are

(1) [that] as a result of the joint venture, Yamaha may have been eliminated as an actual potential entrant into the United States outboard motor market, [and] (2) the joint-venture agreement may have substantially reduced existing competition between Yamaha, Mercury, and others in the United States market, ....

*Brunswick Corp.*, [1979] CCH Trade Reg. Rep. ¶ 21,623, at p. 21,781 (citations omitted).

The Commission's first ground involves application of a theory known as the "actual potential entrant doctrine." In essence the doctrine, under the circumstances of this case, would bar under § 7 acquisitions by a large firm in an oligopolistic market, if the acquisition eliminated the acquired firm as a potential competitor, and if the acquired firm would otherwise have been expected to enter the relevant market *de novo*. To put the question in terms applicable to the present case, would Yamaha, absent the joint venture, probably have entered the U.S. outboard-motor market independently, and would this new entry probably have increased competition more than the joint venture did? We stress the word "probably" in this formulation of the issue, because the question under Section 7 is not whether competition was actually lessened, but whether it "may be" lessened substantially. The question arises here, of course, not in the perhaps more common context of an outright acquisition of a competitor that might otherwise have entered, but in the form of acquisition of stock in a jointly owned company, an acquisition that necessarily foreclosed (for the duration of the joint venture) the independent entry of Yamaha, the other joint venturer.

Although the Supreme Court has yet to rule specifically on the validity of the actual-potential-entrant doctrine,[7] it has delineated two preconditions that must be present, prior to any resolution of the issue. First, it must be shown that the alleged potential entrant had "available feasible means" for entering the relevant market, and second, "that those means offer[ed] a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects." *United*

---

**7.** *United States v. Marine Bancorporation*, 418 U.S. 602, 639, 94 S.Ct. 2856, 2878, 41 L.Ed.2d 978 (1974); see *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). The doctrine has considerable support among the lower courts and legal commentators. See *Brunswick Corp.*, [1979] Trade Reg. Rep. at pp. 21,781–82 n.25. We refer in this opinion to the "actual potential entrant doctrine" because that phrase seems to be in vogue in antitrust circles. We doubt whether such grandiose nomenclature is appropriate. The so-called "doctrine" is only one of many special cases that may or may not, depending on the evidence, involve a substantial lessening of competition. The question before us is simply whether the Commission acted within the zone of choice marked out by the substantial-evidence standard when it found that there would probably have been more competition without the joint venture than with it.

*States v. Marine Bancorporation, supra,* 418 U.S. at 633, 94 S.Ct. at 2875. On this basis the Commission's decision is amply supported by the evidence.

A finding that the first precondition exists, in essence, establishes whether the firm in question is an "actual potential entrant." It is clear that absent the joint venture, *de novo* entry into the United States market, in both the low and high horsepower submarkets, was Yamaha's only alternative, unless it was prepared to abandon the United States market altogether, which is most unlikely. There is substantial evidence to support the finding that such entry into the United States market is an attractive alternative. The United States market for outboard engines is the largest and most sophisticated one in the world. In addition, at the time of the agreement, Yamaha was selling substantial numbers of outboard motors in every developed market in the world, *except* the United States. Yamaha's management had the requisite experience in the production and marketing of outboard motors in areas of the world other than Japan.

There is also evidence that Yamaha had the technology needed to be a viable entrant into the United States market. Yamaha had long been a leader in other parts of the world in production of outboards in the low-horsepower range, and at the time of the agreement was engaged in an ambitious program of development of motors in the high-horsepower range. By 1969 Yamaha had plans to market a 25-horsepower engine in the United States. Engines with 25-horsepower and 55-horsepower ratings were exhibited by Yamaha at the 1972 and 1973 Tokyo boat shows, and the 55-horsepower model was marketed in Japan in 1973 and 1974.[8] Thus Yamaha was close to possessing a "complete line" of models with a wide horsepower range suitable for entry into the United States market.

Brunswick argues that possession of a network of marine dealers to sell and service the outboards was essential, that Yamaha lacked such a network, and that Yamaha was therefore in no position to enter the United States market.

Engines in the high-horsepower range are sold predominantly through dealers, while the low-horsepower models are commonly sold by both dealers and mass merchandisers. The lack of a network of dealers is indeed an obstacle to viable participation in the United States market, but it is probably less so for Yamaha than for others. First, Yamaha, through its sales of motorcycles in the United States, had considerable name recognition. Next, there was evidence that most marine dealers enter into one-year contracts. Thus, recurring opportunities exist for a manufacturer to obtain new dealers. Last, many dealers carry more than one line of outboards, so Yamaha might have been able to persuade established dealers to carry a second line. Sales to mass merchandisers were also available, under the Yamaha brand name or some other brand name. We think the Commission was reasonable in finding that Yamaha had viable opportunities to market its wares effectively in the United States.

As recounted above, the objective evidence of Yamaha's capacity to enter the United States market is substantial. There is also considerable evidence of Yamaha's subjective intent to enter the United States. Prior to the 1972 agreement Yamaha made two less-than-successful attempts to penetrate the United States market. The first attempt came in 1968 when it introduced low-horsepower models into the United States market on a limited scale. This effort failed primarily because the motors were too expensive, and Yamaha's one-cylinder, air-cooled engines were ill-suited to United States consumers, who preferred two-cylinder, water-cooled engines. In 1972 Sears Roebuck & Company offered a 1.5-horsepower Yamaha engine but discontin-

---

8. As a matter of fact, OMC was so impressed by Yamaha's new 25-h. p. model that it upgraded its own 25-h. p. motor. The president of OMC testified that "we had no plans to up-grade the 25-horsepower engine until the Yamaha came along." Transcript of Testimony Before the ALJ (Tr.) 364.

ued the arrangement with Yamaha because the motors proved to be too expensive for Sears customers because of their high quality. These attempts at penetration, coupled with Yamaha's ambitious program to develop high-horsepower models, aimed specifically at the American consumer, indicate a high degree of interest in penetrating the United States market. The 55-h. p. motor that Yamaha exhibited at the 1972 Tokyo boat show was actually being marketed in Japan in 1973. A managing director of Yamaha testified that "with the addition of the 55 horsepower, that is about the time we can go into a developed market like the United States or Canada." Tr. 699.[9]

The record amply supports the Commission's finding that Yamaha had the available feasible means for entering the American outboard-motor market. We next inquire whether "those means offer[ed] a substantial likelihood of ultimately producing deconcentration of [the United States] market or other significant procompetitive effects." *Marine Bancorporation, supra,* 418 U.S. at 633, 94 S.Ct. at 2875. The Commission found that "[i]ndependent entry by Yamaha would certainly have had a significant procompetitive impact." *Brunswick Corp., supra,* [1979] Trade Reg. Rep. at p. 21,784. Given the factual context of this case, support for this conclusion is easily found. We start by re-emphasizing the oligopolistic nature of the outboard-mo-

tor market in the United States. The top four firms had 98.6% of the dollar volume, and the top two, OMC and Brunswick, controlled 85.0% of the market by dollar volume. Any new entrant of Yamaha's stature would have had an obvious procompetitive effect leading to some deconcentration.[10] Yamaha is a well-established international firm with considerable financial strength. In addition, the Yamaha brand name was familiar to American consumers, and Yamaha had considerable marketing experience in the United States.

This evidence notwithstanding, Brunswick argues that the anticompetitive effects of the joint venture were outweighed by the procompetitive effects. The anticompetitive impact of the agreement is said to be mitigated by the temporary nature of the agreement, the introduction of Mariner, a new seller, into the market, and the enhancement of Yamaha's ability to enter *de novo* when the joint venture terminates. The Commission considered these points but concluded that they did not outweigh the anticompetitive effects. That conclusion is supported by the evidence.

The agreement between Yamaha and Brunswick is more properly characterized as "terminable" than as "temporary." By its terms the agreement had a life of ten years with automatic extensions of three years,

**9.** The ALJ's contrary recommendation on the likelihood of Yamaha's actual entry was based in large part on two items of evidence: a written statement by the president of Sanshin that "[i]f the joint venture were not consummated, . . . our possible entry into the United States market on our own would be much delayed," CCX 79–E; and the testimony of a vice-president of Mercury, Tr. 856–58, that Yamaha could not have become a substantial factor in the U.S. market for several years. If the ALJ were a District Court, we would be unable to say that his finding, based on this evidence, was clearly erroneous. But this case is in a different posture entirely. We are reviewing the substantiality of the evidence to support the Commission's, not the ALJ's, findings. These items of evidence are not, in our view, strong enough to call the Commission's findings significantly into question. Both the written statement and the oral testimony referred to came from corporate officials with an incen-

tive to minimize the probability of Yamaha's independent entry. And even if, as regards the live testimony, deference is owed to the ALJ's observation of the witness's demeanor, the same is not true of Sanshin's written statement, which came after the FTC had begun its investigation, and in response to a letter of inquiry from the FTC's Bureau of Competition. The Commission was in just as good a position to assess the weight of this written exhibit, as the ALJ was.

**10.** As the Second Circuit said in *BOC International, Ltd. v. Federal Trade Commission,* 557 F.2d 24, 27 (2d Cir. 1977), "[T]ypically in an oligopolistic situation the entry of a large firm as a new competitor necessarily has significant procompetitive effects, *see Ford Motor Co. v. United States,* 405 U.S. 562, 587, 92 S.Ct. 1142, 1156, 31 L.Ed.2d 492 (1972) . . . (Burger, C. J., concurring and dissenting)."

subject to termination by prior notice of either party.[11]

Brunswick's argument that the agreement offered an immediate procompetitive impact on the market was also considered by the Commission, but found to be lacking. Brunswick's Mercury line was, of course, already in the market. Sanshin's productive capacity was already in existence. The addition of Mariner to the United States market is not of great significance when one considers that it is controlled by Brunswick and cannot be reasonably expected to compete actively with the parent firm. As the Supreme Court said in *United States v. Penn-Olin Co.*, 378 U.S. 158, 169, 84 S.Ct. 1710, 1716, 12 L.Ed.2d 775 (1964) (emphasis ours):

> [i]f the parent companies are in competition, or *might compete* absent the joint venture, it may be assumed that neither will compete with the progeny in its line of commerce.

Further, the chairman of Mariner was the same individual who served as president of Mercury; Brunswick was in a position to veto many of the major corporate decisions at Sanshin because of the make-up of the board of directors; and several elements of the agreement were aimed at minimizing competition between Mercury and Mariner, such as the understanding that Mariner engines would not be sold to existing Mercury dealers. In short, the joint venture did not bring into the market an additional independent decisionmaker, as Brunswick would have us believe, but only added to the productive capacity of the second largest firm in a four-firm-dominated industry.

Brunswick's last argument relative to the agreement's procompetitive effects is that through Yamaha's participation in the agreement, Yamaha's ability to enter the United States *de novo* upon termination of the agreement was greatly enhanced. This argument assumes that the joint venture was temporary and that without it Yamaha lacked the ability to enter the United States market. Both of these propositions are at odds with the Commission's findings. We have already discussed the "temporary" nature of the agreement. As for Yamaha's present ability to enter the market, Brunswick maintains that without certain technological exchanges provided for in the agreement, Yamaha could not possibly have entered the market. The Commission found that by 1973 Yamaha had in production or development the "complete line" of motors needed for viable entry into the United States market. This finding, though not the only permissible inference from the record, has adequate support in the evidence.

Accordingly, the record supports the Commission's finding that the " 'essential preconditions' set out in *Marine Bancorporation* are fully met, and that Yamaha was an actual potential entrant into the [United States]." [12] *Brunswick Corp., supra*, [1979] Trade Reg.Rep. at p. 21,785 (footnote omitted).

The Commission's finding that Brunswick's acquisition of 38% of the stock of Sanshin violated Section 7 of the Clayton Act is supported by substantial evidence on the record as a whole and will be af-

11. Yamaha gave notice of termination one day prior to the date the Commission's decision was rendered. This circumstance is not controlling. The agreement was of indefinite length when the FTC's enforcement proceeding began. Whether it would have been terminated if no complaint had been filed by the FTC is almost completely conjectural.

12. Some courts require a third showing that involves some indication as to when the entry can be expected to occur. In *BOC International, Ltd. v. Federal Trade Commission, supra*, the Commission found a "reasonable probability" of "eventual entry." 557 F.2d at 28–29. The *BOC* court thought this standard lacked a temporal estimate and was therefore unacceptably speculative.

Our situation is very different from that presented by *BOC*. BOC, though it was the world's third largest producer of industrial gases, had never produced or sold industrial gases in the United States. *Id.* at 25. In the case at bar we are presented with a firm that has twice attempted entry into the relevant market, and we have specific findings to the effect that at the time of the joint venture Yamaha was capable of entering the relevant market. We consider this showing considerably more definite than was the case in *BOC*.

firmed.[13] It follows that the joint-venture agreement also violated Section 5 of the FTC Act. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 609, 73 S.Ct. 872, 880, 97 L.Ed. 1277 (1953).[14] It is unnecessary for us to discuss the FTC's alternative ground of decision, that the joint venture also eliminated Yamaha as an actual competitor.

■ Our examination does not end here, however, because the Commission also found certain agreements collateral to the joint venture agreement to be prohibited by § 5. The Commission found three of the collateral agreements to be unreasonable and violative of § 5. The first was a territorial limitation on the sale of outboards under which Yamaha had the exclusive right to sell Sanshin products in Japan under the Yamaha label. Mercury's rights to sell in the Japanese market were unaffected, but Mariner could do no business there. Mariner, however, was granted exclusive rights to market Sanshin products in North America. Up to this point the agreement is arguably a valid one, assuming the validity of the joint venture itself, but there is more. The agreement also provided that Yamaha was barred from producing outboards similar to the Sanshin product or from purchasing for resale, except in Japan, outboards produced by any third party. Thus the agreement permits Brunswick to market outboards, using the Mercury brand, in competition with Mariner throughout the world, but Yamaha is unable to market non-joint-venture products anywhere but in Japan. Yamaha may not engage in any competitive efforts in the United States market with non-joint-venture outboard motors. This limitation can-

not be termed "reasonably necessary" to the purpose of the joint venture. It serves only to insulate Brunswick from Yamaha in the United States market. Brunswick is free to compete with non-joint-venture output through Mercury, both in the United States and in the rest of the world's markets. There is no sufficient reason why Yamaha should not be free to do the same.

Second, there was an agreement between Brunswick and Yamaha to limit competition between themselves in certain "non-exclusive markets," for the most part in Europe and South America. In essence the parties agreed not to seek out the other's dealers in these markets, but rather to concentrate their competitive efforts against other manufacturers. This is merely an agreement between horizontal competitors to direct their efforts elsewhere. It has no substantial relation to any legitimate purpose of the joint venture.

Third, Brunswick and Yamaha entered into a Technical Assistance Agreement which, *inter alia*, granted reciprocal licenses to use each other's technical information. This agreement also barred Brunswick from manufacturing any product competitive with those manufactured by Yamaha, except snowmobiles. This foreclosure of competition between the two firms was viewed by the Commission as an unreasonable extension of the joint-venture agreement. We agree. The agreement is not limited to the subject of the joint venture, the sale of outboard motors, but serves to eliminate possible competition with respect to other products. The Commission's conclusion that these three collateral agreements violated Section 5 was a proper one on this record.

---

**13.** Brunswick also argues that Section 7 cannot have been violated because Sanshin, the company whose stock it acquired, was not "in commerce," as required by the statute during the time period relevant to this case. Sanshin, it says, did nothing in the United States. It simply manufactured motors in Japan. We disagree. A large portion of Sanshin's output was specifically intended for sale in the United States under the Mariner label.

**14.** Section 5 is a general prohibition against unfair methods of competition. It includes but

is not limited to the specific acts and practices condemned by the Sherman and Clayton Acts. The purpose of the particular method or practice need only run "counter to the public policy declared in the Sherman and Clayton Acts, [before] the Federal Trade Commission has the power to suppress it as an unfair method of competition." *Fashion Originators' Guild of America, Inc. v. Federal Trade Commission*, 312 U.S. 457, 463, 61 S.Ct. 703, 706, 85 L.Ed. 949 (1941) (footnote omitted).

■ The last of Brunswick's arguments is that the cease-and-desist order, containing a requirement of complete divestiture to Yamaha of Brunswick's interest in Sanshin and other injunctive provisions, does not bear a reasonable relationship to the violation. We are told that Yamaha, by its notice of termination, has removed any practical need for the proposed relief. Brunswick suggests that it should be allowed to continue owning 38% of the stock of Sanshin, and that an order be entered simply enjoining Yamaha and Brunswick from taking any action which would continue the joint venture and its collateral restrictions beyond the ten-year term.

The Commission ordered complete divestiture in an effort to restore Yamaha to its previous position as a potential entrant into the United States market. The correctness of the Commission's action cannot be seriously questioned, for "complete divestiture is peculiarly appropriate in cases of stock acquisitions which violate § 7." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 328, 81 S.Ct. 1243, 1251, 6 L.Ed.2d 318 (1961) (footnote omitted). Mere termination of the joint venture would leave Brunswick as owner of 38% of Sanshin's stock. Even without continued representation on Sanshin's governing board, Brunswick could exert considerable influence over the corporate policy of Sanshin, thus hindering the restoration of Yamaha as a potential competitor.[15] That portion of the remedial order compelling divestiture is well within the Commission's "wide discretion in its choice of a remedy deemed adequate to cope with the unlawful practices . . . ." *Jacob Siegel Co. v. Federal Trade Commission*, 327 .U.S. 608, 611, 66 S.Ct. 758, 759, 90 L.Ed. 888 (1946).

■ The Commission's order contains other injunctive provisions that (1) prohibit Brunswick from entering into any agreement preventing Yamaha or any other firm from engaging in the manufacture, sale, or distribution of outboard motors in the United States, and (2) require that for a period of three years Brunswick seek prior Commission approval of any acquisition of any firm engaged in the production, distribution, or sale of outboard motors. These provisions, as well as others relating to Brunswick, are reasonably related to the violations found by the Commission. See *Jacob Siegel Co., supra*, 327 U.S. at 613, 66 S.Ct. at 760.

■ *Yamaha's Arguments for Reversal.* Yamaha does not contest the Commission's finding that the joint venture and related agreements violated Section 5 of the FTC Act. It does ask that the basis of the finding of liability on its part be limited to Section 5. Yamaha did not *acquire* any stock; it simply sold Sanshin stock to Brunswick's subsidiary, Mariner. Therefore, we are told, there is no basis for a holding that Section 7, which forbids conduct only by *acquiring* parties, has been violated by Yamaha. The question is not an academic one to Yamaha. Under Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), a final decision by the FTC in a proceeding brought "under the antitrust laws" that a violation of one of those laws has occurred, is *prima facie* evidence against the defendant in a later private action. And under Section 5(i), 15 U.S.C. § 16(i), the bringing by the United States (including the FTC) of a proceeding to prevent ."violations of any of the antitrust laws" suspends the running of the statute of limitations on private antitrust actions as long as that proceeding is pending, and for one year thereafter. Section 7 is one of the "antitrust laws" within the meaning of Sections 5(a) and 5(i) of the Clayton Act, while Section 5 of the FTC Act is not. See Section 1(a) of the Clayton Act, 15 U.S.C. § 12(a); *Nashville Milk Co. v. Carnation Co.*, 355 U.S. 373, 375–76, 78 S.Ct. 352, 353–354, 2 L.Ed.2d 340 (1958).

15. As owner of 38% of Sanshin's voting stock Brunswick would have what amounts to a veto over many significant corporate actions. The Japanese Commercial Code and Sanshin's Articles of Incorporation require a two-thirds majority for certain transactions. Brunswick would be in a position to block transactions such as acquisitions, mergers, issuance of new shares, and changes in authorized capital.

We find it unnecessary to decide on this petition whether a seller, as opposed to a buyer, of stock can ever be in violation of Section 7. For the Commission, both in its brief, see Brief for Respondent 16 n.8, and at the oral argument, has disclaimed any interest in the question. It is content to let the finding as to Yamaha rest solely on Section 5. We will therefore modify the Commission's order accordingly.

■ Yamaha also questions certain aspects of the relief ordered. Under the order, Brunswick must re-sell its Sanshin stock to Yamaha. The sale price is set at "the value of the net tangible assets per share, computed and adjusted to the last day of the six-month term immediately preceding the date of the sale." *Brunswick Corp.*, [1980] CCH Trade Reg. Rep. ¶ 21,740, at p. 21,917. The date of sale is set at "within 90 days of the date [the Commission's] Order becomes final[.]" *Ibid.*

Yamaha proposes a fixed valuation date of October 31, 1979, which is the close of the accounting period immediately preceding the November 9, 1979, decision of the Commission finding the joint venture illegal. Because the Sanshin stock has appreciated in value in the years since the joint venture was entered into, and because Yamaha expects it to continue to appreciate, Yamaha argues that the Commission's failure to fix a date certain for valuation works an undue hardship on it. We are told that allowing Brunswick's holdings to increase in value discourages Yamaha from further investment in Sanshin and encourages delay during the appeal period. Yamaha also argues that the added financial burden lessens its viability as a competitor.

The goal of the relief ordered here was the restoration "so far as practicable and equitable, [of] the state of competition in the relevant market as it would have been but for the acquisition." *Brunswick, supra,* at p. 21,913, citing *Fruehauf Trailer Co.*, 68

F.T.C. 1167, 1168 (1965), *modified,* 69 F.T.C. 180 (1966). In pursuit of that goal the Commission found that a simple rescission of the agreement, requiring resale of the Sanshin stock at the original price, would impose a substantial economic hardship on Brunswick. In an attempt to be fair to both parties, the Commission selected the valuation formula (net tangible assets per share) contained in the joint-venture agreement, which we assume was the product of arms' length bargaining. As for the failure to fix the date of valuation, as suggested by Yamaha, the Commission said:

> Since considerable time may pass before our order is effectuated, we believe that both parties should share in any appreciation in the value of Sanshin's assets.

*Brunswick, supra,* at p. 21,916 n.26.

Yamaha argues, in sum, that Brunswick has been treated too leniently. We cannot agree. One must consider that both Brunswick *and* Yamaha have been found to be in violation of the law. With this in mind the Commission attempted to minimize the economic hardship to each party, but only after determining that complete rescission of the joint venture agreement was the sole effective remedy. See *United States v. du Pont & Co., supra,* 366 U.S. at 326–27, 81 S.Ct. at 1250. This aspect of the Commission's order is clearly within the bounds of reasonableness.

Yamaha questions next paragraph V of the relief order, which prohibits Yamaha from entering into any agreement which prevents it "from manufacturing, selling, or distributing outboard motors in the United States." [16] Yamaha specifically argues that this paragraph would bar certain vertical restrictions, such as distribution and retail marketing agreements, that may have procompetitive effects. For example, a likely avenue of Yamaha's initial entry into the United States market would involve a series of distributional and retail marketing ar-

---

**16.** Paragraph V of the relief order reads in full:

It Is Further Ordered that from the date this Order becomes final, Yamaha shall not enter into, continue to be a party to, or observe any agreement which in whole or in part prevents Yamaha from manufacturing, selling, or distributing outboard motors in the United States, its territories or possessions. *Brunswick, supra,* at p. 21,918.

rangements with suitable business entities in the United States. Such arrangements often provide for exclusive territories that restrict competition between the parties in assigned areas. Yet, Paragraph V of the order, if read literally, would, in advance and without exception, prevent Yamaha from agreeing that it would not itself make direct sales in one of its dealers' or distributors' primary areas of responsibility.

■ The Supreme Court in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), recognized that such vertical restrictions often restrict intrabrand competition while promoting interbrand competition, thus enabling a manufacturer to compete more effectively with other manufacturers. The Court gave the following example of the positive aspects of vertical restrictions:

> For example *new manufacturers and manufacturers entering new markets* can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer. Established manufacturers can use them to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products, such as automobiles and major household appliances. The availability and quality of such services affect a manufacturer's goodwill and the competitiveness of his product. Because of market imperfections such as the so-called "free rider" effect, these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did.

*Id.* at 55, 97 S.Ct. at 2560. (emphasis ours). We do not see why Yamaha, a firm seeking to enter the United States market, should not have the option of employing some if not all of the above strategies. None of Yamaha's conduct that has been held illegal related to vertical restraints on persons buying goods from it for resale. The competition suppressed by the joint-venture agreement was primarily horizontal (either actual or potential). The Commission argues that the arrangement also imposed a vertical restraint on Yamaha, in the sense that one of the collateral agreements prohibited Yamaha from buying certain products for resale from any seller other than Sanshin, except for resale in Japan. This provision is wholly unrelated to the kind of downstream vertical restraint on dealers and distributors that Yamaha may wish to use as it attempts to make a new and independent entry into the U.S. market. We conclude that the order, to the extent that it makes such restraints unlawful *per se*, so to speak, goes beyond any reasonable relationship to the violations found. This is not to say that Yamaha will have *carte blanche* to impose whatever downstream vertical restraints it wishes on itself or its dealers and distributors, but only that nothing in the FTC's remedial order should make such restraints illegal in and of themselves. It will still be open to any aggrieved party to challenge Yamaha's future conduct. The challenge, however, must come in a new proceeding and be assessed under the rule of reason, as explicated in *GTE Sylvania*.

■ Last, Yamaha challenges paragraph VI of the relief order, which prohibits Yamaha, for a period of three years, without the approval of the FTC, from acquiring any interest in firms "engaged in the production, distribution or sale of outboard motors in or for the United States." *Brunswick, supra,* at p. 21,918. This acquisition ban, it is argued, although equally applicable to Brunswick, is unreasonable as to Yamaha because it was not the acquiring party under the illegal joint-venture agreement. The Commission justifies this provision of the order, first, by noting that Yamaha, through the joint venture, has once chosen to enter the United States market in an anticompetitive manner. Requiring Yamaha to come before the Commission prior to entering the market by acquisition will simply insure that any future acquisi-

tion is not anticompetitive. This supervisory provision puts a tolerable burden on Yamaha's future conduct and is clearly within the bounds of reasonableness. Paragraph VI of the relief order is affirmed.

## IV. CONCLUSION

The order of the Federal Trade Commission is modified by adding at the foot thereof the following new paragraphs:

### IX.

Nothing in this Order or in the opinions of the Commission in this case shall be construed as a finding or conclusion that Yamaha has violated Section 7 of the Clayton Act. All findings and relief against Yamaha are based solely on Section 5 of the Federal Trade Commission Act.

### X.

Nothing in this Order, including in particular Paragraphs IV or V hereof, shall prevent either Brunswick, Mariner, or Yamaha, respectively, from imposing upon itself, its dealers, or its distributors, ancillary vertical restraints in connection with the sale by it for resale in the United States of outboard motors.

Although Brunswick did not make the specific challenge to paragraph IV of the order that Yamaha made to paragraph V, we believe that it would be in the interests of justice to modify both paragraphs in the same way, so as to avoid giving either Yamaha or Brunswick an unfair advantage. As so modified, the order of the Commission is affirmed. One-half of respondent's costs shall be taxed against Brunswick and Mariner. No costs are to be taxed against either Yamaha or respondent.

It is so ordered.