**TOWER AIR, INC., Plaintiff,**

v.

**FEDERAL EXPRESS CORPORATION, Defendant.**

**No. 94–CV–5677 (JS).**

United States District Court,
E.D. New York.

Oct. 15, 1996.

Howard J. August, Colamarine & Sohns, New York City, C. Alexander Hewes, Jr., Hewes, Morella, Gelband & Lamberton, Washington, D.C., for Plaintiff.

Lawrence Mentz, Biedermann, Hoenig, Massamillo & Ruff, New York City, Colby S. Morgan, Federal Express Corporation, Memphis, TN, for Defendant.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

### INTRODUCTION

Plaintiff Tower Air, Inc. ("Tower") brings this action against defendant Federal Express Corporation ("Federal Express") asserting a number of causes of action arising from the participation of Tower Air and Federal Express in a joint venture to provide civilian air support to the Military Air Command ("MAC") in times of national emergency. Federal Express now moves to dismiss Tower's Claims XII through XV for failure to state a cause of action under the Sherman Act. Federal Express further moves to dismiss Claims I through XI of Tower's complaint on the basis of lack of subject matter jurisdiction, or in the alternative, that this Court should decline to extend supplemental jurisdiction over these claims. Finally, Federal Express also moves to dismiss Claims I through XI on the grounds that Tower failed to assert these claims as compulsory counterclaims in a prior related litigation instituted in Tennessee state court by Federal Express against Tower.

For the following reasons, the Court hereby converts Federal Express's motion to dismiss as to Claims XII through XV into one for summary judgment and denies that motion. The Court further denies Federal Express's motion to dismiss as to Claims I through XI.

### FACTUAL BACKGROUND

#### A. The CRAF Program and the MAC Contract

In 1950, Congress established the "Civil Reserve Air Fleet" or "CRAF Program,"

under which the Department of Defense ("DOD") could call upon private air carriers to supply airlift resources in times of national emergency to augment existing military capabilities. Private carriers participating in the CRAF Program were required to provide committed air support during various phases of military activation. The operation of the CRAF Program was managed by the then-named Military Air Command ("MAC").

The Government, in contracting for air support under the CRAF Program, engaged a number of contractors to provide these services. The government ordered service from all MAC airlift service contractors on an equitable pro rata basis, giving consideration, among other things, to each contractor's aircraft commitment to the requirements of the CRAF stage which had been activated. Once a contractor participated in the CRAF Program, it was then eligible to compete for MAC peacetime annual airlift services contracts. These peacetime flights were only offered to carriers that were CRAF participants or agreed to become CRAF participants.

In 1989, the government issued a solicitation for bids on a MAC contract to provide private air service to the government for guaranteed fixed-schedule flights, CRAF activation and expansion-peacetime operations (the "MAC Contract"). As per the solicitation, otherwise known as a "Request for Proposal" or "RFP," prices to be paid for all fixed and expansion services would be determined at the MAC negotiated uniform rates and in accordance with a Memorandum of Understanding issued by the Air Force. The government intended the contract to be an award of a multi-year indefinite quantity fixed unit price contract.

The RFP provided that joint ventures could participate as a single contractor to provide the air services required under the MAC Contract. Because the MAC Contract required both passenger and freighter air service, such joint ventures enabled carriers who provided primarily one type of service to join together and present a more attractive package to MAC. The MAC Contract required, however, that if a contractor was a joint venture, the terms of the joint venture agreements had to correspond to the terms of the MAC Contract and had to provide for one designated and authorized party to bind the joint venture in dealings with the government. In addition, the joint venture agreement had to provide for (1) joint and several liability among the members, (2) one member to act the sole payee for all revenues earned by members of the joint venture and (3) a statement of unity of purpose among the members. Moreover, the MAC Contract prohibited any member of a joint venture participating under the MAC Contract from competing on an individual basis for the same awards.

In deciding whether or not to make an award under the MAC Contract, the government would consider: (1) the number of aircraft by type that the contractor was making available for CRAF activation purposes and (2) the mobilization value of the committed aircraft. As a separate incentive to induce airlines to participate in the CRAF Program, the DOD conferred mobilization value points ("MV Points") to each participant. These MV Points allowed airlines the opportunity to operate routine MAC operational and training flights during peacetime, for which the airlines earned agreed-upon revenues.

B. *The Joint Venture Agreement*

To be able to successfully compete for the MAC Contract, on May 10, 1989, Tower and Federal Express entered into a joint venture agreement (the "JV Agreement"), along with the Flying Tiger Line Inc., Northwest Airlines, Inc. ("Northwest"), United Parcel Service Co. and its parent United Parcel Service of America, Inc. (collectively, "UPS"), and Pan American World Airways, Inc. ("Pan Am"). The stated purpose of the JV Agreement was to form a joint venture: (1) to contract with MAC as a single entity in order to satisfy military requirements for CRAF participation, (2) to obtain eligibility for MAC fixed contract flights and (3) to obtain eligibility for peacetime expansion flights. JV Agreement, Exhibit A to Complaint, at 1.

Under the JV agreement, each participant pledged the use of specified aircraft to the joint venture for use in the CRAF Program for the 1990–1992 CRAF Cycle as per the MAC Contract. The parties further agreed

that Federal Express would represent and bind the JV in its dealings with MAC. JV Agreement ¶ 6. Invoices for services provided to MAC were to be billed directly to MAC, which would then pay Federal Express, as the sole payee for the JV. *Id.* ¶ 7. Federal Express would then remit payment to the appropriate carrier "for MAC flights operated by the Joint Venture." Moreover, the terms of the JV Agreement were not to be modified unless in writing and signed by authorized representatives of the parties. *Id.* ¶ 12(b). Tennessee law governed the JV agreement.

### C. *The Supplemental Agreements*

In addition, on May 10, 1989, Federal Express and Tower entered into a separate supplemental agreement to the JV Agreement. MAC would, from time to time, offer to the JV additional passenger flights not included in the fixed flights under the MAC Contract. These additional flights were termed "Expansion Flights." Under the Tower Supplemental Agreement, when either Federal Express or Northwest did not have aircraft available to meet MAC's needs for these Expansion Flights, Federal Express promised to refer the Expansion Flights to Tower. If Tower then operated these flights, it would pay Federal Express a 2½% commission of the gross revenues payable by MAC.

Federal Express also entered into supplemental agreements with Northwest, UPS and Pan Am. On May 12, 1989, Federal Express and Northwest entered into an agreement supplemental to the JV Agreement and the JV Operating Agreement (the "Northwest Supplemental Agreement"). According to Tower, the terms of the Northwest Supplemental Agreement provided for:

(a) the division of the market for MAC Program flights for Category Y and B Passengers and Category B Cargo flights by allocating

(i) all Pacific Category Y passenger service flights and all North Atlantic Category Y passenger service flights originating in Boston, Detroit and Minneapolis to Northwest;

(ii) all North Atlantic Category Y passenger service flights except for those originating in Boston, Detroit and Minneapolis to other JV participants;

(iii) all Category B cargo flights to Federal Express;

(iv) Category B passenger service to Federal Express and Northwest according to an agreed upon formula, with Northwest having a right of first refusal on all Atlantic flights not flown by Federal Express and on all Expansion Flights not flown by Federal Express; and

(v) Category B passenger Expansion Flights not operated by Federal Express or Northwest to Tower Air.

(b) Division between Federal Express and Northwest of the JV participants entitlement benefits under the MAC Contract to fly the most desirable flights, i.e. fixed contract passenger and cargo flights, such that Federal Express received all of the entitlements of UPS and Tower Air, and Federal Express and Northwest split the entitlements of Pan Am.

(c) Allocation of commissions received from Tower Air and Pan Am to Federal Express and Northwest; and

(d) Covenants to take no action which could adversely affect the aforesaid division of the market and revenues therefrom.

Complaint, ¶ 89.

On May 11, 1989, Federal Express and Pan Am entered into an agreement to supplement the JV Agreement and the JV Operating Agreement (the "Pan Am Supplemental Agreement"). According to Tower, this agreement provides for:

(a) the division of the market for MAC Program flights for Category Y and B Passenger flights and Category B Cargo flights by allocating

(i) all North Atlantic Category Y passenger service flights except for those originating in Boston, Detroit and Minneapolis to Pan Am;

(ii) all Pacific Category Y passenger service flights and all North Atlantic Category Y passenger service flights originating in Boston, Detroit and Minneapolis to Northwest;

(iii) all Category B cargo flights to Federal Express;

(iv) Category B passenger service to Federal Express and Northwest, with some Category B Expansion Service to be assigned to Tower Air by Federal Express; and

(b) payment of commissions by Pan Am to Federal Express on compensation paid to Pan Am by MAC for Category Y passengers carried by Pan Am as a result of Pan Am's participation in the Joint Venture.

Complaint, ¶ 90.

On May 12, 1989, Federal Express and UPS entered into a supplemental agreement to the JV Agreement (the "UPS Supplemental Agreement"), which provided that:

(a) Federal Express would pay UPS a fixed percentage of the value of the MAC Contract, paid monthly and a percentage of revenues received by Federal Express as a result of Northwest's, Pan Am's and Tower Air's participation in the Joint Venture:

(b) UPS would give Federal Express all of its entitlement flights and to undertake flights under the MAC Contract only if Federal Express was unable to do so.

Complaint, ¶ 91.

In its complaint, Tower also claims that Federal Express made similar agreements with Delta Airlines ("Delta"), Trans World Airlines, Inc. ("TWA") and United Airlines, Inc. ("United"), who were not parties to the JV Agreement, under which Federal Express collected commissions for flights awarded by MAC to the joint venture. Complaint, ¶ 92.

### D. *The Gulf War*

MAC first made use of the services available under the JV Agreement beginning in 1990 with the outbreak of the war in the Persian Gulf. On August 17, 1990, MAC ordered a Stage I CRAF activation with the commencement of Operation Desert Shield. By January 17, 1991, MAC elevated its requirements to Stage II CRAF activation with the start of operation Desert Storm. By May 17, 1991, MAC reclassified activation to Stage I, and by May 24, 1991, all activation stages were terminated.

From January 1, 1990 to December 31, 1992, MAC dealt directly with Tower to arrange military flights on Tower's aircraft. Although payment was exchanged solely between Federal Express and MAC, MAC would communicate directly with each air carrier to schedule missions under the CRAF Program under MACR 55–8, Section 3–4. In accordance with the JV Agreement, Tower then billed MAC directly for services relating to the use of its aircraft. MAC then remitted payment to Federal Express for payment to Tower. Tower claims that Federal Express unjustly withheld $4,029,689 from the payment sent by MAC as a commission of 2½ % due under an agreement between Tower and Federal Express. Tower also claims that other carriers were paid directly by MAC for services under the JV Agreement.

### E. *Litigation History*

In February, 1993, Tower filed a complaint against Federal Express in the Eastern District of New York, through diversity jurisdiction, regarding the state law claims arising out an alleged breach of the JV Agreement or the Tower Supplemental Agreement. Having discovered that no diversity existed, Judge Dearie dismissed the action.

In August, 1994, Federal Express filed a complaint against Tower in Tennessee state court based on state law claims arising out of the same contracts. The state case is currently pending.

In December, 1994, Tower refiled the instant federal case with this Court, adding its antitrust claims and asserting federal question jurisdiction under 28 U.S.C. § 1331 and pendent jurisdiction for its state law claims under 15 U.S.C. § 4.

### DISCUSSION

### I. STANDARDS GOVERNING THIS MOTION

#### A. *Conversion into a Motion for Summary Judgment*

A district court should grant a motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with

the allegations.' " *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). In applying this standard, a district court must "read the facts alleged in the complaint in the light most favorable" to the plaintiff, and accept these allegations as true. *Id.* at 249, 109 S.Ct. at 2906; *see Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 167–68 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (citing Fed.R.Civ.P. 8(a)(2) to demonstrate liberal system of 'notice pleading' employed by the Federal Rules of Civil Procedure).

According to Rule 12(b), however, if, on a motion asserting failure to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. A district court may not convert a motion under Fed.R.Civ.P. 12(b)(6) into a Rule 56 motion for summary judgment without sufficient notice to the opposing party to respond. *Groden v. Random House, Inc.,* 61 F.3d 1045 (2d Cir.1995). The essential inquiry is whether the plaintiff should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings. *In re G & A Books, Inc.,* 770 F.2d 288, 294–95 (2d Cir.1985), *cert. denied sub. nom M.J.M. Exhibitors v. Stern,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986).

In deciding whether to convert a motion to dismiss into one for summary judgment, the Court recognizes that the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. *Cortec Indust. Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir.1991),

*cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). When a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may under certain circumstances take the document into consideration in deciding the defendant's motion to dismiss without converting the proceeding to one for summary judgment. *Id.* at 47–48; *International Audiotext Network, Inc. v. AT & T,* 62 F.3d 69, 72 (2d Cir.1995). In addition, the Court may consider documents annexed to the movant's papers which, although not annexed to the complaint, plaintiff either had in his possession or had knowledge of and upon which he relied in bringing suit. *Roucchio v. Coughlin,* 923 F.Supp. 360, 366 (E.D.N.Y. 1996) (Seybert, J.) (citing *Cortec,* 949 F.2d at 48). The Second Circuit has warned, however, that it is error to consider factual allegations contained in legal briefs or memoranda without converting the motion to one for summary judgment. *Fonte v. Board of Managers of Continental Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988).

Tower's complaint in this action only attaches the JV Agreement and the Tower Supplemental Agreement, yet refers to various secret supplemental agreements between Federal Express and other air carrier partners and non-partners to the joint venture. In opposing defendant's motion, however, Tower submitted additional documentation to counter Federal Express' arguments. Among the exhibits were a deposition extract, correspondence, MAC rates and regulations, and the Joint Venture Operating Agreement for the JV. Federal Express also provided additional documents for the Court's consideration, including an affidavit, correspondence regarding the Tower Supplemental Agreement, excerpts from the RFP, a Memorandum of Understanding and pleadings from the prior litigations. Moreover, Tower's reply papers rely on outside matters and supply facts that go beyond those alleged in the complaint, including more in-depth analysis of the payment mechanisms under the MAC Contract. *See* Tower's Memorandum in Opposition to Federal Express's Motion to Dismiss, at 5–8.

When a non-movant offers supplemental submissions, and the Court wishes to consider them, conversion is only inappropriate if the movant did not have adequate notice that the motion might be treated as one for summary judgment. *B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162, 167 (S.D.N.Y.1995). In their moving papers, both parties have acknowledged the possibility that the Court would convert this motion into summary judgment. Tower's Memorandum in Opposition to Federal Expires's Motion to Dismiss, at 4–5; Federal Express's Reply Memorandum in Support of its Motion to Dismiss, at 2–3. Federal Express's motion goes as far as to provide a section dedicated to "Undisputed Facts Relevant to Determination of Motion." Federal Express's Reply Memorandum in Support of its Motion to Dismiss, at 11–15.

■ Because of the complexity of the factual allegations in this action and of the fact-intensive nature of antitrust analysis, the Court finds it necessary to consider matters outside the complaint to assess the claims in this case. As noted above, both parties were on notice of the potential for converting this motion. The Court will therefore proceed to treat this motion as one for summary judgment, and apply that standard accordingly.

### B. *Standard for Summary Judgment*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under the law of the Second Circuit, a district court must weigh several considerations in evaluating whether to grant a motion for summary judgment with respect to a particular claim. *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994) (internal case citations omitted). First, the moving party carries the burden to demonstrate that no genuine issue respecting any material fact exists. *Id.* (citations omitted). Second, all ambiguities and inferences must be resolved in favor of the non-moving party. *Id.* Third, the moving party may

obtain summary judgment by showing that no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight. *Id.* Finally, the trial court's duty is confined to issue-finding and does not extend to issue-resolution. *Id.*

In evaluating the above considerations, a court must be mindful of whether the purported factual dispute is material, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ In this action, the Court also heeds the words of the Supreme Court in *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles."

### II. ANTITRUST CLAIMS

This case presents unique and complex issues regarding the application of antitrust law to government contracting. The issues presented here are further complicated because we are not dealing with single entities bidding on a government contract. Rather, the Court is faced with a dispute between two members of a joint venture that was formed specifically to meet the needs of a specified government contract. The joint venture was formed ostensibly to pool resources and complement each other's capabilities to make their proposal more attractive to the government purchasing agency. For these reasons, complex issues arise not only regarding the application of antitrust law to government contracts, but the application to joint ventures as well.

In light of these complexities, the Court will first address some of the special considerations in assessing antitrust claims arising in connection with government contracts. This includes ascertaining the relevant market under a government contract. Second, the Court will analyze the applicability of antitrust law to joint ventures and agreements ancillary to those combinations.

### A. Antitrust Law and Government Contracts

Government contractors are not strangers to antitrust scrutiny. The courts have been called upon to assess the antitrust implications of bid-rigging to obtain contracts, price-fixing among competitors for public contracts and agreements to refrain from bidding. See United States v. Koppers Co., 652 F.2d 290 (2d Cir.), cert. denied, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981); United States v. Champion Int'l Corp., 557 F.2d 1270 (9th Cir.), cert. denied, 434 U.S. 938, 98 S.Ct. 428, 429 54 L.Ed.2d 298 (1977); Compact v. Metropolitan Government of Nashville & Davidson County, 594 F.Supp. 1567 (M.D.Tenn.1984). Markets created by the government, therefore, are ripe for predatory and anti-competitive conduct just as in other commercial markets. The government contracting arena, however, provides certain special circumstances that do not exist in general commercial purchasing.

### 1. The Government as Monopsonist

First and foremost, in a market created by a government contract, there is only one purchaser—a specific department of the government on one proposed sale, i.e., one request for proposal. Charles L. Eger, Contractor Team Arrangements Under the Antitrust Laws, 17 Pub. Con. L.J. 595, 616 (1988). As a sole purchaser or "monopsonist," the government enjoys considerable economic power and can prescribe certain procedures and safety nets prior to awarding a contract to a joint venture. Peter B. Work, Antitrust Issues Relating to Arrangements and Practices of Government Contractors and Procuring Agencies in Markets for Specialized Government Products, 57 Antitrust L.J. 543, 545 (1988). For example, the government can require contractors (1) to sign certificates stating that their prices are based on current, accurate and complete cost data,(2) to accept fixed-price contracts and (3) to limit profits under cost-type contracts. Id. at 544–545. In this case, for instance, Federal Express asserts that the ·government negotiated uniform rates in accordance with a Memorandum of Understanding between the participating carriers and the government. Deft's Mem. in Support of its Motion to Dismiss, at 15.

Simply because the government enjoys his power, however, does not mean that no anti-competitive conduct can occur. Indeed, the fact that the Federal Acquisition Regulations specifically require joint venture bidders to comply with antitrust laws suggests that the government itself perceives a market in which anti-competitive acts can occur each time a government contract is issued. 48 C.F.R. § 9.604 (1995).

### 2. The Relevant Market Under a Government Contract

Determining the relevant product market under a government contract is a substantial obstacle. Assuming that the government creates a market for a certain product or system when it issues a Request for Proposal, this market is very narrow and specific, based upon detailed specifications and requirements.

■ The definition of the relevant market, however, is critical to Tower's antitrust claims under the Clayton Act and the Sherman Act. First, Tower seeks a private remedy for its antitrust claims under § 4 of the Clayton Act, 15 U.S.C. § 15, which provides that any person injured in their business by reason of a violation of antitrust law may sue for treble damages. To obtain this relief, Tower must show (1) that the alleged loss is the type of injury the antitrust laws were intended to prevent and (2) that the antitrust violation was the cause in fact of such injury. Brunswick Corp. v. Pueblo Bowl–O–Mat, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); Disenos Artisticos E. Industriales, S.A. v. Work, 676 F.Supp. 1254, 1276 (E.D.N.Y.1987). Lack of causation in fact between antitrust injury and alleged antitrust violation is fatal to the merits of any antitrust claim. Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 41 (2d Cir.), cert. denied, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). The injury, however, must reflect the anti-competitive effects of either the alleged violation or of anti-competitive acts made possible by the violation in the relevant market. Brunswick Corp., 429 U.S. at 489, 97 S.Ct. at 697. The determination of whether Tower has standing and inju-

ry, therefore, necessitates a finding as to the relevant market.

Second, Tower's claims under § 1 of the Sherman Act alleging illegal restraint of trade cannot be assessed without determining the relevant market. For the reasons set forth *infra*, the Court will apply the "rule of reason" analysis in assessing the restraints imposed under the JV Agreement and the Supplemental Agreements. A threshold issue in analysis under the rule of reason, however, is the appropriate definition of the relevant market. *Disenos*, 676 F.Supp. at 1283.

Third, analysis of Tower's remaining monopoly claims under § 2 of the Sherman Act also requires a determination of the relevant market. To make out a claim for monopoly, Tower will have to show that Federal Express had monopoly power in a *relevant market*. *Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 244 (2d Cir.1992). Likewise, in its claim of attempted monopoly, Tower will have to show that Federal Express had a "dangerous probability" of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). To evaluate this element, the court must define the relevant market. *Id.* 506 U.S. 447, 113 S.Ct. at 891.

The essential inquiry for this Court, therefore, is the definition of the relevant market under the facts presented. As a motion for summary judgment, the Court must find that the undisputed facts support its conclusion as a matter of law.

■ In the general realm of antitrust law, the Supreme Court articulated the traditional test for determining the product market in *United States v. E.I. DuPont De Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The Court stated that a market is composed of products that have reasonable interchangeability for the purpose for which they are produced, and a court must consider price, use and qualities. *Id.* at 404, 76 S.Ct. at 1012; *see also State of New York v. Anheuser–Busch, Inc.*, 811 F.Supp. 848, 871 (E.D.N.Y.1993). The Court emphasized the importance of the purchaser's willingness to substitute one commodity for another. *Du-*

*Pont,* 351 U.S. at 393, 76 S.Ct. at 1003. Because a relevant market includes all products which are reasonably interchangeable, plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal. *E & G Gabriel v. Gabriel Bros., Inc.*, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994).

Moreover, in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court found that a market may be composed of various well-defined submarkets for antitrust purposes, based on various practical indicia, including, *inter alia*, industry or customer recognition of the submarket as a separate economic market, the products' peculiar circumstances and uses, and distinct prices. *Id.* at 325, S.Ct. at 1524; *see also Grumman Corp. v. LTV Corp.*, 527 F.Supp. 86, 89 (E.D.N.Y. 1981), *aff'd*, 665 F.2d 10 (2d Cir.1981). In *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C.Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987), Judge Bork noted that in that these indicia are evidentiary proxies for direct proof of substitutability.

As noted above, however, in the context of a complex government contract calling for a number of different services and providing detailed requirements and specifications, the traditional analysis of "interchangeability" is difficult to apply. Indeed, the "relevant market" for antitrust analysis is hotly debated between the parties in this case. The inquiry is further complicated by the complexity of facts and the disputed interpretation of those facts by the parties.

Tower argues that there are essentially four relevant markets for the Court to consider. First, there is the market for air passenger and cargo transportation services under the MAC Program and the CRAF Program. Second, there is the submarket for Expansion Flights under these programs. Third, there is the market for international trans-Atlantic and trans-Pacific air service under the MAC Program and the CRAF Program. Fourth, there is the market for trans-Atlantic and trans-Pacific Expansion

Flights under these programs. Tower claims that these relevant markets are discrete submarkets of the overall market for sale of air passenger and cargo transportation services to the U.S. government. Complt. ¶ 84.

Federal Express, on the other hand, contends that a single government contract cannot create a market for antitrust purposes. Deft's Reply Mem., at 6. Even if it could, Federal Express argues that its limited duration of only 33 months does not impact antitrust concerns. *Id.* Furthermore, Federal Express claims that under Tower's analysis, the Court would have to find the following factual and legal premises:

(1) discrete portions of a single government contract can be submarkets;

(2) the MAC Contract with the JV is a separate market, despite contracts with other carriers and joint ventures;

(3) the 1990 to 1992 CRAF Program cycle is distinct from the market consisting of the government's continuing demand for air transport services.

Deft's Reply Mem., at 5.

Finally, Federal Express concedes that if any market exists, it can only be the CRAF Program, but strenuously argues that there cannot, as a matter of law, be submarkets for fixed and Expansion Flights under the MAC Contract because they were never separately offered or contracted for by the Government. Reply Mem. at 6.

Tower counters these arguments by asserting that a discrete submarket for expansion flights did exist. First, the parties to the joint venture were free to compete with each other and with other CRAF Program participants based on the variable cost factors for Expansion Flights. Second, MAC reserved the right to select any carrier for a given Expansion Flight. Third, only the price per passenger mile and the number of nautical miles for flight routes were fixed; all other components of the pricing formula specified in the MAC Contract for Expansion Flights, including ferrying costs and allowable cabin load, were variable and subject to free competition among carriers.

Tower also argues that there are discrete submarkets for fixed and Expansion Flights because they are not interchangeable or substitutable. First, Expansion Flights are unscheduled flights added on short notice in addition to regularly scheduled fixed flights. Second, the market for Expansion Flights is competitive, whereas the market for fixed flights was not. Moreover, both CRAF air carriers and MAC treated the market for Expansion Flights as a separate submarket with respect to how flights were awarded, priced and administered.

Finally, Tower asserts that the fact that the government contract had a limited and finite term did not mean there could not be any market. Even a single market can be a relevant market. Plt's Opp. Mem. (citing *F. Buddie Contracting, Inc. v. Seawright*, 595 F.Supp. 422, 438 (N.D.Ohio 1984)).

■ The Court rejects Federal Express's argument that no market can exist under a single government contract. In other cases involving antitrust allegations in connection with the award of government contracts, the courts have found or assumed that the contract itself can be the relevant market. *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1055 (9th Cir.1983), *cert. denied,* 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983); *Compact,* 594 F.Supp. at 1571; *Grumman Corp.,* 527 F.Supp. at 89. The fact the Government is the sole domestic purchaser and regulates this sale does not mean that no market exists. *Northrop,* 705 F.2d at 1055. Moreover, as noted earlier, the Federal Acquisition Regulations protect against anti-competitive conduct in government procurement.

■ Accepting that there can be a relevant market to define, the difficult issue is which market is relevant. Both Tower and Federal Express have made arguments relying on the interpretation of the MAC Contract. Their arguments have also raised numerous disputed facts, including the ability of individual carriers to bid for Expansion Flights within the MAC Contract, the variability of the price for such flights and the factors that MAC considers in awarding such flights. The Court can hardly find, therefore, that the undisputed facts point to a particular relevant market. Without a rele-

vant market in which to assess the alleged anti-competitive acts, the Court cannot rule as a matter of law as to any of Tower's claims. For this reason, the Court must deny Federal Express's motion, considered here as a motion for summary judgment.

Even if the Court could resolve the facts and rule as to the relevant market, however, a significant number of disputed facts exist as to the other elements of Tower's claim that would preclude granting Federal Express's motion.

### B. *Claim XII and Claim XIII— Restraint of Trade*

■ A plaintiff alleging a § 1 violation must allege concerted action by two or more persons that unreasonably restrains interstate or foreign trade or commerce. *In re Nasdaq Market–Makers Antitrust Litig.*, 894 F.Supp. 703, 710 (S.D.N.Y.1995). Thus, a complaint alleging a conspiracy in violation of the Sherman Act must identify co-conspirators and describe the nature and effects of the alleged conspiracy or combination. *Reiter's Beer Distrib. v. Christian Schmidt Brewing*, 657 F.Supp. 136, 142 (E.D.N.Y. 1987); *International Television Prods. Ltd. v. Twentieth Century–Fox Television Div. of Twentieth Century–Fox Film Corp.*, 622 F.Supp. 1532, 1537 (S.D.N.Y.1985).

#### 1. Concerted Action

■ A plaintiff claiming an antitrust conspiracy must first establish either a combination or some form of concerted action between at least two legally distinct economic entities. It is essential to any claim in restraint of trade to establish the existence of an agreement between two or more independent entities. *Disenos*, 676 F.Supp. at 1280. A unilateral or independent act does not create conspiratorial liability under the Sherman Act. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 542 (2d Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993).

Although the parties do not dispute the existence of either the JV Agreement or the Supplemental Agreements, Federal Express claims that Tower has failed to meet this requirement because it only identified Federal Express as a conspirator. Deft's Motion at 18. In *International Television Prods.*, however, the district court found that where the complaint named the two parties to an agreement and specified the content of the agreement, there could be no question that there was sufficient notice as to the identity of the co-conspirators. 622 F.Supp. at 1537. In the present case, the complaint sets forth at least three potential co-conspirators along with Federal Express. Tower refers to and provides excerpts from alleged "secret" agreements between Federal Express and Northwest (Complt. ¶ 89), Pan Am (Complt. ¶ 90) and UPS (Complt. ¶ 91). Tower also alleges that Federal Express made secret agreements with Delta, TWA and United (Complt. ¶ 92).

■ The Second Circuit has found, however, circumstances with respect to an alleged conspiracy to restrain trade must be such as to warrant a finding that conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement. *Int'l Dist. Ctrs. v. Walsh Trucking Co.*, 812 F.2d 786 (2d Cir.), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987) (citations omitted). In its opposition papers, Tower suggests that "Northwest appears to have knowingly aided in and accepted the benefits of the Federal Express's web of secret agreements, as evidenced by the terms of its secret agreement with Federal Express where the two carriers agreed to divide the CRAF market, mobilization value points, and Pan Am commissions." Pl's Opposition and Complt. ¶ 89. At this point, however, the Court cannot rule as a matter of law on the undisputed facts that any of the other parties had the requisite intent to achieve an unlawful objective.

Federal Express also contends that the other joint venturers cannot be considered co-conspirers where they function as a single economic unit.[1] Deft's Motion in Support of

---

1. Federal Express argues that neither MAC nor any other federal government instrumentality are

Its Motion to Dismiss, at 20 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984)). Joint ventures may operate lawfully if there is sufficient economic integration among the members. The Supreme Court in *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) suggested that competitors who form a joint venture must pool resources and capital, as well as share in the risks of profit and loss. 457 U.S. at 356, 102 S.Ct. at 2479. In addition, the Federal Acquisition Regulations set out the various types of economic interests that are acceptable in such arrangements, including the ability to complement each other's unique capabilities and to offer the government the best combination of performance, cost, and delivery for the product being acquired and provide that contractor team arrangements may not exist in violation of antitrust statutes. 48 C.F.R. § 9.602.

Tower asserts that the joint venture here did not form a single economic unit and therefore the members could be considered co-conspirators and violate the antitrust laws. First, the JV Agreement, and an operating agreement related to the JV Agreement, prohibited the pooling of capital and sharing of the risks of profit or loss. Each party was required to indemnify the other parties, to be solely liable for claims arising from its performance under the MAC Contract and to obtain at its own expense insurance to cover such liabilities.

As to the element of concerted action, therefore, the Court finds that there continues to be disputed issues of material fact that preclude ruling as a matter of law on this issue.

### 2. The Agreement Unreasonably Restrained Trade

■ Restraints imposed by an agreement between competitors are denominated as horizontal restraints, while those imposed by agreement between firms at different levels of distribution are vertical restraints. *Business Electronics Corp. v. Sharp Elecs.*, 485 U.S. 717, 730, 108 S.Ct. 1515, 1522–23,

99 L.Ed.2d 808 (1988). As noted above, competitors at the same level can lawfully combine if there is sufficient economic integration. In this case, "contractor team arrangements" are specifically provided for in the Federal Acquisition Regulations and under the solicitation for the MAC Contract. *See* 48 C.F.R § 9.601.

■ Moreover, side agreements to joint ventures can operate lawfully as well. Restraints collateral to but necessary for the implementation of a lawful agreement, and which are no broader in scope than necessary to accomplish the purpose of the agreement, are termed "ancillary." Eger, *supra*, at 613. This doctrine was first advanced nearly a hundred years ago in *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 282 (C.C.A.9th Cir.1898), *aff'd*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). Then Circuit Judge Taft found that:

> no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract.... [To be lawful,] the contract must be one in which there is a main purpose, to which the covenant in restraint of trade is merely ancillary.

*Id.* at 282. Thus, to be lawful, the ancillary restraint must be subordinate to a separate, legitimate transaction and serve to make the main transaction more effective in accomplishing its purpose. *Rothery Storage*, 792 F.2d at 229.

Joint ventures and their ancillary agreements, however, are not exempt from antitrust review. In *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), the Supreme Court ruled that the mere label of "joint venture" is not enough to immunize such combinations from illegal restraint of trade. 341 U.S. at 597, 71 S.Ct. at 974. These activities, as combinations among horizontal competitors, can be deemed unreasonable restraints on trade.

a "person" within the meaning of the Sherman Act. Deft's Motion at 19 (citing *United States v.*

*Cooper Corp.*, 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941)).

■ There are two rules courts use to assess whether a horizontal agreement constitutes an unreasonable restraint on trade. A court will apply the rule of *per se* liability when the agreement or practice at issue appears on its face to be one that would almost always act to restrict competition within the market. *Gregoris Motors v. Nissan Motor Corp.*, 630 F.Supp. 902, 906 (E.D.N.Y.1986). When a practice or agreement is not plainly anti-competitive, courts apply the traditional rule of reason, which requires the defendant to demonstrate that the procompetitive aspects of the challenged agreement outweigh any anti-competitive aspects. *Hertz Corp. v. City of New York*, 1 F.3d 121, 130 (2d Cir. 1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375, (1994). In determining whether particular concerted action violates § 1 of the Sherman Act, there is a presumption in favor of the rule of reason standard and departure from that standard must be justified by demonstrable economic effect, rather than formalistic distinctions. *Business Elecs. Corp.*, 485 U.S. at 724, 108 S.Ct. at 1519.

The *per se* rule is only used in the relatively narrow circumstances where courts have had sufficient experience with the activity to recognize that it is plainly anti-competitive and lacks any redeeming value. *Hertz Corp.*, 1 F.3d at 129; *Gregoris Motors*, 630 F.Supp. at 906. In these circumstances, the defendant's actions must be so obviously harmful to competition and so clearly lacking in any redeeming pro-competitive values that they are conclusively presumed illegal without further examination. *Capital Imaging*, 996 F.2d at 543.

When the alleged restraint of trade is not plainly anti-competitive, the court must apply the rule of reason and determine whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. *Clorox Co. v. Winthrop*, 836 F.Supp. 983, 989 (E.D.N.Y. 1993). Under the rule of reason, the court must weigh all circumstances of the case in deciding whether the restrictive practice should be prohibited as an unreasonable restraint on competition. *Anheuser–Busch*,

673 F.Supp. at 666–667. In this respect, the court must balance the pro-competitive and anti-competitive effects of any restraint; it is not sufficient that plaintiff prove either anti-competitive intent or effect. *U.S. Football League v. National Football League*, 842 F.2d 1335, 1360 (2d Cir.1988).

■ In this action, the Court will apply the rule of reason to analyze these claims. The Court finds that in this context, there is not "sufficient experience with the activity to recognize that it is plainly anti-competitive and lacks any redeeming value." *Hertz Corp.*, 1 F.3d at 129. This Court distinguishes the cases that applied *per se* liability to joint ventures and ancillary agreements in other contexts. In *Compact v. The Metropolitan Government of Nashville and Davidson County, Tennessee*, 594 F.Supp. 1567 (M.D.Tenn.1984), the district court held that:

> Federal courts will not hesitate to apply the *per se* rule to impose Section 1 liability upon a finding of some intrusive or ancillary aspect of the joint venture agreement which falls within the well-defined parameters of the per se rule.

594 F.Supp. at 1575 (citing *Timken Roller Bearing*, 341 U.S. at 598, 71 S.Ct. at 974). In that case, however, the district court found that because the joint venture had a blanket prohibition on its individual members rights to compete for the public contract at issue, competition was preempted between COMPACT and its members and between the individual COMPACT members themselves. 594 F.Supp. at 1577–78. This case is inapplicable because here, the restriction from bidding individually comes from the MAC contract itself.

Tower also cites *Yamaha Motor Corp. v. FTC*, 657 F.2d 971, 981 (8th Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 174 (1982), to support its contention that side agreements among joint venturers can still rise to the level of per se antitrust violations. In *Yamaha*, the 8th Circuit found that side agreements to a joint venture that divided the geographical and product markets and restrained the members from competing with each other in shared markets were *per se* illegal. 657 F.2d at 980. Again, this case can be distinguished from the pres-

ent facts. In *Yamaha*, the collateral agreements at issue banned the members of the joint venture from producing or selling outboard motors outside the joint venture. In this case, however, it is MAC that prohibits independent efforts by the joint venturers from providing air services, not the agreements between Federal Express and any of the other members. Moreover, the court in *Yamaha* noted that the portions of the agreements that gave each member of the joint venture an exclusive territory was arguably valid. *Id.* at 981.

The Court will also apply the rule of reason rather than the *per se* rule because the anti-competitive aspects of the joint venture and the supplemental agreement in this case are not plainly apparent.[2] On the one hand, the joint venture provides a method of organization which enables air carriers involved to join together to produce a combined product of passenger and cargo transport that is beyond the capacity of the individual members. On the other hand, the supplemental agreements set a precise scheme of how Expansion Flights will be allocated if awarded, which may raise costs to the government.

Tower further claims that Federal Express' actions were *per se* violations because the supplemental agreements divided the market for air passenger services sold to MAC pursuant to the MAC Program. The supplemental agreements, however, merely allocated which members of the joint venture would operate certain flights, if awarded to the joint venture. It is unclear what effect this territorial restriction had on competition for the joint venture to obtain such Expansion Flights. As noted again and again, MAC required that air carriers give up their rights to compete independently for awards once the joint venture was accepted as a participant in the CRAF Program.

Finally, Tower alleges a *per se* violation in that Federal Express fixed, stabilized and maintained the cost to MAC for such services. Complt. ¶ 96. Federal Express disputes this fact and argues that it simply could not fix the prices. The MAC Contract contained detailed formulas for rates, regulations and price determination and the parties signed a Certificate of Independent Price Determination.

Because of the disputed facts, which preclude a finding as a matter of law that the *per se* rule applies, the Court will proceed to analyze the undisputed facts under the rule of reason test. A party claiming unreasonable restraint of trade under the rule of reason must prove more than an injury to itself; it must prove that competition in the relevant market was harmed. *Disenos,* 676 F.Supp. at 1283. As noted earlier, the relevant market for purposes of this analysis cannot be determined as a matter of law because of the disputed facts among the parties.

 Even if the market could be defined as a matter of law, however, the court must assess whether competition in that market has been harmed. Under the rule of reason analysis, a plaintiff must demonstrate a precise harm which is a restraint on competition, not merely a harm to a competitor. *Gregoris Motors,* 630 F.Supp. at 906. Tower must demonstrate therefore that the injury it suffered causes a lessening of competition in the market as a whole. *Id.*

Tower alleges that the supplemental agreements unreasonably restrained trade by creating preferential payment and workshares among the joint venturers. Furthermore, it claims that these agreements created a horizontal division of markets among competitors and imposed duties on the parties to refrain from bidding against each other on CRAF Expansion Flights. Plt's Opposition, at 13. As such, these restrictions were so broad they suppressed competition without creating any efficiencies. *Id.*

Federal Express, on the other hand, claims that these agreements do not exclude any JV member from obtaining benefits under the MAC Contract. Deft's Reply Mem., at 8. Rather, they are reasonable efforts to pre-

---

2. Joint ventures present a difficult concept for antitrust analysis, defying neat classification and precise definition and, by extension, well established rules for evaluating their competitive im-

pact. *Compact v. Metropolitan Govt. of Nashville & Davidson Cty.,* 594 F.Supp. 1567, 1574 (M.D.Tenn.1984).

vent "free riding" on the part of participants in the Joint Venture. *Id.* (citing *Rothery Storage,* 792 F.2d at 212–13). A free ride can pose a serious threat to the efficiency of a joint venture because the partner that provides capital and resources without receiving compensation has a strong incentive to provide less, thus rendering the common enterprise less effective. 792 F.2d at 212–13.

Federal Express also argues that the work share allocation and preferences in the supplemental agreements were reasonable to achieve the purposes of the JV because it reflected the number of aircraft committed by each carrier. Through the JV Agreement, Federal Express committed 16 DC–10 cargo planes, Northwest committed 29 747 passenger planes, 20 DC–10 passenger planes and 8 747 cargo planes. Tower, on the other hand, committed overall 3 747 passenger planes. Moreover, the JV could be eligible for higher MV Points the more cargo planes committed. Northwest and Federal Express together committed 24 cargo planes, whereas Tower committed none.

Again, the material facts are disputed as to whether the alleged restraints in the Supplemental Agreements are unreasonable. The Court cannot, therefore, rule as a matter of law on Tower's § 1 claim. As discussed below, factual disputes are also prevalent in Tower's § 2 claims.

### C. *Claim XIV—Monopoly*

Monopoly in and of itself is not unlawful. *National Ass'n of Pharmaceutical Mfrs. v. Ayerst Labs.,* 850 F.2d 904, 915 (2d Cir.1988). To make out claim of monopolization under the Sherman Act, a plaintiff must establish that the defendant had monopoly power in a relevant market, that the defendant engaged in anti-competitive conduct, and that its injury was, in fact, caused by the defendant's violation of antitrust laws. *Irvin Indus.,* 974 F.2d at 244. The defendant's activities must consist of willful acquisition or maintenance of monopoly power, as distinguished from growth or development as a consequence of superior product, business acumen or historic accident. *Ayerst Labs.,* 850 F.2d at 915. To prove a monopolist willfully acquired monopoly power, a plaintiff must prove that the alleged monopolist used

or attempted to use monopoly power to foreclose competition, gain competitive advantage, or destroy competitors; this element requires proof of exclusionary or anti-competitive intent and effect. *Clorox,* 836 F.Supp. at 993.

In the present case, to meet the first prong of the test, Tower claims that by means of obtaining separate, secret agreements from potential competitors, which agreements Federal Express characterized as supplemental to the JV Agreement, Federal Express placed itself in a position to ensure that it had a preferential opportunity to operate all Category B Expansion Flights, to control the referral and distribution of Expansion Flights, to charge other air carriers a fee for referral of such flights, and to control all competitive price negotiations between MAC and the other participants in the Joint Venture so as to ensure that the price of Expansion Flights would be stabilized at non-competitive levels higher than what MAC would have been required to pay if there were free competition.

In addition, Tower asserts that it need not specify a precise percentage of the market share controlled by Federal Express to meet this aspect of the cause of action. Plaintiff's Opp. (citing *General Elec. Co. v. Bucyrus–Erie Co.,* 563 F.Supp. 970, 977 (S.D.N.Y. 1983); *Phone Programs Ill. v. National Jockey Club, Inc.,* 692 F.Supp. 879 (N.D.Ill. 1988)). In this respect, Tower contends that further discovery is needed to ascertain market share.

Tower does assert, however, that Federal Express achieved a 72% share of all MV points, which entitled Federal Express to dominance in the market for peacetime Fixed Flights. Tower argues that although the MAC Contract provided that MV points would only be a secondary factor in awarding Expansion Flights, Federal Express sought to obtain monopoly leverage over the competitive market for Expansion Flights by "enforcing an interpretation of the secret agreements calculated to guarantee its control over the same dominant 72 share of that market." Pltf's Opp. Mem. (citing *Virgin*

*Atlantic Airways, Ltd. v. British Airways, PLC,* 872 F.Supp. 52 (S.D.N.Y.1994)).

Federal Express, on the other hand, claims that it was factually impossible for it to undertake any of these anti-competitive activities under any market that Tower could define. First, the agreement and JV were only limited to a 33 month period. Second, none of its activities had any impact on any other joint venturers or individual bidders or participants. Supp. Mem. at 5. Third, its acts did not affect entry in any way into the market, as defined by Tower. Id. Fourth, Federal Express did not have the power to set prices or exclude competition from this market because the government set the prices and picked which joint venture would satisfy its needs for this market. Fifth, any monopoly power was conferred by the government through MV points, calculated on the basis of the government's preferences and needs.

These arguments make clear that the facts underlying Tower's allegations of monopoly are contested. For this reason, the Court finds that it cannot rule as a matter of law that Federal Express did or did not have monopoly power. The disputed facts also preclude granting summary judgment as to the issue of attempted monopoly, as discussed below.

### D. *Claim XV—Attempt to Monopolize*

■ In order to establish a § 2 attempted monopolization claim, plaintiff must prove: (1) that the defendant engaged in predatory or anticompetitive conduct (2) with the specific intent to monopolize (3) and a dangerous possibility of achieving monopoly power exists. *B.V. Optische Industrie De Oude Delft v. Hologic,* 909 F.Supp. 162, 171 (S.D.N.Y. 1995) (citing *Spectrum Sports,* 506 U.S. at 456, 113 S.Ct. at 890–91). Proof of the first element may be used to infer second element and, when coupled with proof of monopoly power, may demonstrate a dangerous probability of success. *Volvo N. Am. v. Men's Int'l Prof. Tennis Council,* 857 F.2d 55, 74 (2d Cir.1988).

■ As noted when discussing the relevant market, a dangerous probability of success may exist where the defendant possesses a significant market share when it undertakes the challenged anti-competitive conduct. See *H.L. Hayden Co. v. Siemens Medical Systems,* 879 F.2d 1005, 1018 (2d Cir.1989). To make this finding, however, it is necessary for the court to define the relevant product market. *Spectrum Sports,* 506 U.S. at 456, 113 S.Ct. at 890. Because the Court cannot determine the relevant market at this point, it is unable to reach a conclusion as to this issue on the basis of undisputed facts.

For the foregoing reasons, the Court denies Federal Express's motion for summary judgment as to all of Tower's antitrust claims. The Court now turns to assessing its jurisdiction over Tower's state law claims.

### III. DISMISSAL OF CLAIMS I TO XI

#### A. *Supplemental Jurisdiction*

■ A district court may exercise supplemental jurisdiction over state law claims whenever federal law claims and state law claims in a case derive from a common nucleus of operative fact and are such that plaintiff would ordinarily be expected to try them all in one judicial proceeding. *Block v. First Blood Assocs.,* 988 F.2d 344, 351 (2d Cir. 1993) (citation omitted). The decision whether to exercise such jurisdiction is entirely within the discretion of the district court. *Id.* Among the factors a district court will consider are judicial economy, convenience, fairness and federal-state comity. *Id.*

Federal Express argues that in the event the Court denies its motion as to the antitrust claims, it should nevertheless decline to exercise any supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(c)(2). Section 1367(c)(2) provides that a district court may decline to exercise supplemental jurisdiction over a claim if the state claim substantially predominates over the federal claims.

■ In this action, Tower has raised state law claims based on contract, tort and fiduciary duty. Each one of these claims arises out of alleged violations of the JV Agreement, the JV operating Agreement and the Supplemental Agreements, which are at

issue in the antitrust portion of this case. Indeed, any finding as to the validity of Tower's antitrust claims may directly implicate the legality of these agreements. For this reason, the Court will continue to exercise supplemental jurisdiction over these state law claims.

### B. *State Compulsory Counterclaims.*

Federal Express argues in the alternative that Tower's state law claims should be dismissed because they must be raised as compulsory counterclaims in the Tennessee litigation.

 Federal Express cites *Adam v. Jacobs,* 950 F.2d 89 (2d Cir.1991) to support its argument that Tower's claims should be dismissed. In *Jacobs,* however, the Second Circuit noted that at least in the context of the federal rule pertaining to compulsory counterclaims, the rule was "directed against one who failed to assert a counterclaim in one action and then instituted a second action in which that counterclaim became the basis of the complaint." *Id.* at 93 (citing *Southern Constr. Co. v. Pickard,* 371 U.S. 57, 60, 83 S.Ct. 108,· 110, 9 L.Ed.2d 31 (1962)). What Federal Express failed to note about that case, however, was the only grounds for federal jurisdiction was diversity of citizenship. In this case, federal antitrust claims are involved that will bear on the validity of the state law claims. Moreover, Federal Express seems to have conveniently forgotten that Tower filed the first action in the Eastern District of New York, which Judge Dearie dismissed without prejudice. In the interim before Tower had the opportunity to refile, Federal Express instituted action in Tennessee state court based on the same contracts in issue in the first action, fully aware that Tower would be raising antitrust claims on those same activities.

For these reasons, and the reasons stated above with respect to supplemental jurisdiction, the Court will retain jurisdiction over Tower's state law claims.

### CONCLUSION

For the foregoing reasons, Federal Express's motion for summary judgment as to Claims XII through XV is denied and Federal Express's motion to dismiss Claims I through XI is denied.

SO ORDERED.